CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
10/8/2020
JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| ASHLEY NICOLE NOONAN, ) <br> Formerly known as ) <br> ASHLEY CULPEPPER, ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CONSOLIDATED SHOE ) <br> COMPANY INC. ) <br> ) <br> Defendant. ) | Civil Action No. 6:20CV00068 |

**CIVIL COMPLAINT FOR MONETARY AND EQUITABLE RELIEF**

Plaintiff Ashley Nicole Noonan, formerly known as Ashley Culpepper, ("Culpepper") herein by and through undersigned counsel, files this suit against Consolidated Shoe Company Inc. ("CSC") for violations of The Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964.

## Introduction

1. CSC violated the Equal Pay Act when it subjected Culpepper to unequal pay for comparable work performed by male colleagues.

2. CSC violated the Equal Pay Act when it retaliated against Culpepper for complaining about her unequal pay and for seeking to have her complaints redressed.

3. CSC violated Title VII of the Civil Rights Act of 1964 when it subjected Culpepper to disparate treatment, including unequal pay for the work she performed, based on her sex.

4. CSC violated Title VII of the Civil Rights Act of 1964 when it retaliated against Culpepper for complaining about her unequal pay and for seeking

to have her complaints redressed.

## Jurisdiction and Venue

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because the action arises under the laws of the United States of America, namely the Equal Pay Act, and Title VII.

6. Culpepper has exhausted the administrative remedies available to her with the Equal Employment Opportunity Commission ("EEOC") under Title VII of the Civil Rights Act of 1964.

7. The EEOC issued Culpepper a Notice of Right to Sue on September 24, 2020.

8. This Court has personal jurisdiction over CSC because it has substantial and deliberate contacts with the Commonwealth of Virginia and it conducts business in the Commonwealth of Virginia.

9. Venue in this district and division is appropriate pursuant to 28 U.S.C. § 1391 because CSC has significant and deliberate contacts with this district and division.

10. Venue in this district and division is also appropriate pursuant to 28 U.S.C. § 1391 because it is the district and division where the substantial majority of the events giving rise to these claims occurred.

## Factual History

11. Culpepper has significant experience working in the field of Digital and Creative Marketing.

12. Culpepper is a 28 year old woman and is a resident of Forest, Virginia.

13. Culpepper earned a Bachelor of Communications in Print Journalism and two minors in Public Relations and Advertising and Writing from Liberty University in 2013.

14. Prior to working at CSC, Culpepper worked as the Marketing Manager for Minnieland Academy where she was responsible for creating all of the marketing material including the design of business cards, handbooks, newspapers, and magazines.

15. From 2014-2019 she also worked as a consultant for Top Line Media Team, where she worked several hours a month on independent writing and design projects for websites, blogs, and social media.

16. In February 2016, Culpepper accepted the position of Content Media Coordinator at CSC and worked as a de facto graphic designer. This position included: responsibility for developing creative content for e-commerce sites and required a strong background in writing, web content management and visual marketing. Requirements for the position, according to CSC's own job description, included experience in managing websites, photography and graphic design capabilities. It also required a working knowledge of Adobe Creative Suite, including Photoshop, Illustrator, and InDesign.

17. Culpepper more than fulfilled the basic requirements of the position when hired.

18. Culpepper was initially offered a salary of $37,000 a year, she rejected it, and then was offered a salary of $39,000. This was less money than Culpepper had been making in her previous position.

19. Throughout her entire tenure at CSC, Culpepper made $39,000 annually.

20. During her tenure at CSC, Culpepper engaged in brand photography, graphic design, creating strong brand imagery, web content management, visual marketing and creative writing and email marketing when needed.

21. From February 2016 to October 2016, Culpepper was a member of the Marketing Team which consisted of Liz McDade, Tanya Fischoff, Yoora Wang, Culpepper, and for a brief period another employee, Taylor, who handled social media.

22. Taylor handled social media for approximately one month until Culpepper took over those duties and performed them until Liz McDade was hired; Tanya handled marketing trends and analytics, Sorority partnerships, SEO and some minor PR before her position evolved.

23. Culpepper performed the duties as outlined in the job description for Content Media Coordinator.

24. From February 2016 to October 2016, Yoora Hwang was the Graphic

Designer on the Marketing Team.

25. Hwang had been the graphic designer for 1-2 years. Under information and belief her salary was similar to that of Culpepper's.

26. After her departure, in October, November, and December 2016 Culpepper was responsible for all Graphic Design assignments.

27. In January 2017, Kristina Petrick was hired as the Creative Director. Petrick was Culpepper's direct supervisor, was a high-level manager, and had the authority to hire and fire employees.

28. From January 2017, Culpepper continued to be responsible for the majority of graphic design assignments, in addition to other assignments including photography and writing assignments.

29. From October 2016 to October 2018, Culpepper was responsible for the majority of graphic design assignments including: eblasts and content for e-commerce sites, all photography, video shooting and editing, creation of catalogs in InDesign for 7 brands, creation of lookbooks in InDesign for 7 brands, and creation of notecards.

30. From October 2016 to October 2018, Culpepper was responsible for creating the majority of all Marketing Team materials while Petrick maintained management responsibility for the Team, including assignments work and final editorial control.

31. From October 2016 to October 2018, Culpepper received overall positive feedback on her work product from Petrick and other co-workers.

32. In December 2016, Culpepper had a review conducted by Cheryl Valentine. This review was overall positive and the two discussed constructive feedback on Culpepper's performance.

33. In December 2017, Culpepper had a positive review conducted by Petrick.

34. In the Spring of 2018, Petrick expressed her optimism about the growth potential of the department and mentioned how she wanted to support Culpepper in moving into a more senior position with management responsibility.

35. In late 2018, Petrick informed Culpepper that CSC would be hiring a

graphic designer. In Petrick's words this new employee was going to be a huge help to Culpepper – to take the majority of graphics off her plate so she could focus on the photography.

36. In October 2018, CSC hired Mathew Wiese, a male who was given the title of Senior Graphic Designer.

37. Wiese was given a salary of approximately $ 67,999.88 annually.

38. Under information and belief, Wiese upon his hiring in October 2018 was offered a salary similar to Culpepper, which Wiese refused and he was subsequently given more money as he requested.

39. In December 2018, shortly after Wiese was hired, Culpepper requested a raise and was told that the company was not giving raises.

40. Wiese is of the same approximate age as Culpepper, they graduated from the same University, and they were in the same School of Communications and Arts.

41. Under information and belief, Culpepper had more experience in the area of creative marketing than Weise.

42. Prior to Wiese's hiring, Culpepper was performing all of the job duties Wiese was eventually assigned. Essentially CSC took Culpepper's job and created two jobs from it, paying Culpepper's male successor $28,999.88 more per year.

43. Weise was given responsibility over the same products that Culpepper was responsible for from 2016-2018, including: catalogues, lookbooks, notecards, and e-mail marketing.

44. Culpepper had been successful in increasing the monetary conversion of CSC's email marketing by thousands of dollars.

45. When Wiese was hired at CSC, he was given the title of Senior Graphic Designer, and Culpepper, after requesting a new title, was given the new title of Senior Photographer and PR Specialist, but was not given a raise as she requested.

46. Upon transitioning many of her graphic design tasks to Wiese, other co-workers stated that they missed working with Culpepper on these tasks as she did a good job handling them.

47. The three positions required equal skills, efforts and responsibilities according to the following CSC job descriptions:

| Content Marketing Coordinator | Sr. Photographer and PR Specialist | Sr. Graphic Designer |
|---|---|---|
| Responsible for developing creative content for ecommerce sites by engaging with consumers and by continuing to hone the distinct identity | Responsible for developing creative content for ecommerce sites by engaging with consumers and by continuing to hone the distinct identity | Experience in creative writing

Experience in web management platforms such as Shopify and Squarespace |
| Requires strong background in writing, web content management and visual marketing | Requires strong background in writing, web content management and visual marketing | Experience in creative writing

Experience in web management platforms such as Shopify and Squarespace |
| Experience managing websites, photography and graphic design a must | Experience managing websites, photography and graphic design a must | Provide analytical reports of KPIs for web, advertisements, and various campaigns |
| Increases consumer engagement with strong imagery, graphic design and compelling writing | Increases consumer engagement with strong imagery, graphic design and compelling writing | Able to follow brand guidelines while inventing new ways to present the branded message in both visual and written communication

Advise creative, innovative strategies to reach a particular target audience

Determine campaign messaging and visual |

| | | |
|---|---|---|
| | | design to convey a specific message<br><br>Incorporate changes recommended by clients and the creative team<br><br>The ability to present new ideas to teammates, management and clients |
| Coordinates and executes photography for branded lifestyle imagery | Coordinates and executes photography for branded lifestyle imagery | |
| Photography skills with fashion photography focus a plus | Executes photography for e-commerce sites, social media and show rooms<br><br>Films products and campaign video featuring top style shoes<br><br>Executes and edits lifestyle, studio and flat lay photography using Adobe Creative Suite | Create various media including print, video and audio conveying a specific product or message<br><br>Review and proof designs for errors |
| Coordinates and assembles design of e-mail marketing campaigns or online sales | | |
| Working knowledge of Adobe Creative Suite including Photoshop, Illustrator & InDesign | Uses working knowledge of Adobe Creative Suite programs including Photoshop, Premier, | Strong experience in Adobe InDesign, Photoshop, Illustrator and Premier |

|  | Illustrator and InDesign |  |
| --- | --- | --- |
| Coordinating updates to e-commerce sites using consistent copy and design to optimize traffic<br><br>Working knowledge of search engine optimization and inbound marketing a plus | Manages product photos and SEO Alt-Tags for online stores inventory<br><br>Executes SEO projects to increase online traffic | Develop copy content for websites, blogs, articles, press releases, product descriptions, marketing materials, campaigns and SEO<br><br>Provide analytical reports of KPIs for web, advertisements, and various campaigns |
| Coordinating marketing tactics directly with the Director of Sales and Marketing | Works closely with sales team to handle show media requests and print advertising deadlines |  |
| Gaining deep insights into fashion consumers and researching and creating compelling fashion blog posts and on-brand product descriptions<br><br>Excellent written and oral communication skills, especially blogging and medium format writing | Assists in contributing to branded blogs with photography content and writing | Develop copy content for websites, blogs, articles, press releases, product descriptions, marketing materials, campaigns and SEO |
|  | Creates imagery for look-books, catalogs, brochures, postcards, business cards, and posters<br><br>Composes press releases for national placements | Develop layout and graphics for product illustrations, logos, catalogs, lookbooks, direct mail, advertisements, email marketing, social media, videos, websites, and other |

| | | |
|---|---|---|
| | | forms of media |
| Increasing institutional capability and knowledge of inbound marketing principals<br><br>Working knowledge of content management and web design principles | Works with top social influencers to obtain high quality imagery for brand awareness and marketing materials<br><br>Interacts with media and advertising agencies to create brand awareness and exposure<br><br>Works with editors, writers and bloggers to gain media attention for brands | Constantly in pursuit of excellence, following the latest design trends and the fashion industry in an exciting, fast-paced environment<br><br>Able to follow brand guidelines while inventing new ways to present the branded message in both visual and written communication<br><br>Advise creative, innovative strategies to reach a particular target audience<br><br>Determine campaign messaging and visual design to convey a specific message<br><br>Incorporate changes recommended by clients and the creative team<br><br>The ability to present new ideas to teammates, management and clients |
| | Manages corporate internship program for creative marketing materials | |

| | | |
|---|---|---|
| | Manages budget for public relations initiatives and shoe collaborations | |
| Bachelors' degree in creative writing, communications, digital media or other relevant field<br><br>Three of more years of relevant working experience<br><br>Other challenging and interesting work as assigned | | Bachelor's degree in graphic design<br><br>2+ years experience working in the field of graphic design<br><br>Work as a team with co-workers and the creative director to determine the scope of various projects<br><br>Experience in the fashion or retail industry preferred<br><br>Knowledge of Mac OS and software upgrades Proficiency in Microsoft Office<br><br>Team player mentality that's flexible and open to working outside of the box and standard realms of responsibilities, supporting the company as a whole<br><br>Open to personal growth through constructive criticism and client feedback<br><br>Sense of urgency in a fast-paced, deadline- |

|  |  | orientated environment |
|---|---|---|
|  |  | Creative genius with the ability to identify and execute new, exciting ways to present products and ideas |
|  |  | Great attention to detail with a perfectionist approach to design execution |

48. Until March 2020 (because of Covid-19) both Culpepper and Wiese worked at the same physical location, in an office setting, and worked full-time Monday through Friday, 8 am to 5pm, using the same level of equipment, they both had access to and used the same programs.

49. Culpepper had an additional level of responsibility, starting in Fall 2016 Culpepper created and thereafter managed CSC's internship program, managing between 1-2 college age interns at a time.

50. Culpepper learned in December 2019 that Wiese made approximately $28,999.88 more per year than she did.

51. The three positions of Content Marketing Coordinator, Sr. Photographer and PR Specialist, and Sr. Graphic designer required equal skill, effort and responsibility.

52. The jobs were very much alike and were closely related to each other, assignments between the three positions were shifted easily depending upon workload and need.

53. On December 13, 2019, Culpepper had a review with her supervisor Petrick. During that review, Petrick stated that she would advocate for Culpepper to have a raise.

54. Petrick told Culpepper that the CEO was open to the possibility of a raise, but Culpepper needed to send an email describing her success in 2019 and her role evolution as a whole.

55. After the review was completed, Culpepper left Petrick's office, then returned several minutes later and brought the discriminatory pay practice to the attention of her direct supervisor.

56. Petrick informed Culpepper at that time that it was illegal for her to have this information and told her that it was a fireable offense.

57. The CSC handbook specifically and illegally attempts to prohibit employees from discussing their salary.

58. At the end of that meeting, Culpepper feared that CSC would illegally fire her because she brought discriminatory pay practices to the attention of her direct supervisor.

59. Upon the insistence of Petrick, Culpepper emailed CSC's CEO, Cam Knight, about the discriminatory pay practices and asked that it be remedied.

60. After bringing the discriminatory pay practices to the attention of management, Culpepper was not given any such raise as Petrick promised to advocate for on her behalf.

61. CSC purported to perform an "investigation" into the discriminatory pay practices and in February 23, 2020 informed Culpepper that her position and Weise's position were not similar because Culpepper was more "Administrative" despite the fact that Weise and Culpepper both had Senior titles.

62. Under information and belief, Petrick did not advocate on Culpepper's behalf for a raise. Instead, she began giving Culpepper an excessive amount of unwarranted negative feedback on her work and began taking away her job duties.

63. For example, Petrick, after more than a year of approving the same model, suddenly began criticizing Culpepper's choice of unpaid model and began taking away photoshoots from Culpepper.

64. Petrick began to dramatically reduce the number of creative assignments given to Culpepper in December 2019, including important photography to be used in major campaigns that Culpepper had handled since she started at CSC.

65. The stripping of these assignments from Culpepper was significantly

detrimental to Culpepper as it took away important opportunities for professional accomplishment and advancement and were intended to diminish Culpepper's Senior role to an Administrative one.

66. Petrick took away all of Culpepper's responsibility for email marketing starting in 2020 after she spoke to Petrick about unequal pay.

67. Petrick took away Culpepper's responsibility for email marketing and informed co-workers not to include Culpepper on email marketing projects which Culpepper had been responsible for since starting with the company.

68. Culpepper learned only from the co-worker that this responsibility had been taken away from her, as Petrick refused to communicate that directly to Culpepper.

69. This negative feedback and diminishment in responsibilities continued until Culpepper was terminated from her position with CSC in June 2020.

70. At the time of her termination, Culpepper had been effectively assigned to a job with significantly different job responsibilities as she had in December 2019.

71. Culpepper was informed that her position was being terminated because of business related concerns due to Covid-19. Under information and belief, CSC received money pursuant to the Paycheck Protection Program, which was designed to keep employees at their jobs.

72. Despite receiving this money, CSC terminated Culpepper and Weise. However, under information and belief, CSC gave Wiese a positive reference in his job search and refused to allow any employee of the company to give Culpepper any job reference.

73. From the time she brought the discriminatory pay practices to the attention of CSC in December 2019 to her termination, CSC continued to pay Culpepper significantly less than it pays male employees who perform substantially the same work under substantially the same conditions as Culpepper.

**COUNT I**
**The Equal Pay Act of 1963 ("EPA") 29 U.S.C. § 206(d)**
**Unequal Pay - Willful**

74. Culpepper incorporates and re-alleges the allegations in the foregoing paragraphs as though alleged fully herein.

75. Culpepper is an "employee" as defined by 29 U.S.C. § 203(e)(2)(ii).

76. Defendants are "employers" as defined by 29 U.S.C. § 203(d).

77. Culpepper is a female.

78. Culpepper's comparator is Mathew Weise.

79. Culpepper performed work that requires at least equal, if not more, skill, effort, and responsibility as those of her male colleague.

80. Culpepper worked under similar conditions as her male colleague.

81. Culpepper's comparable male colleague received compensation of $67,999.88 annually while she received compensation of $39,000 annually.

82. From October 2016 to October 2018, Culpepper performed all of the duties eventually assigned to Weise, yet CSC has compensated and continued to compensate her at a significantly lower rate than Weise.

83. CSC failed to compensate Culpepper comparable to employees who: are of the opposite sex, work in the same establishment as Culpepper, perform work equal to or comparable to that of Culpepper, retain positions that require equal skill, effort and responsibility as Culpepper, and perform their work under similar conditions as Culpepper.

84. CSC's violation of the Equal Pay Act in regard to Culpepper was willful and reckless.

85. CSC knowingly and willfully set Culpepper's pay at a level substantially below that of her male colleagues.

86. CSC ignored Culpepper's complaints about the disparity in her pay.

87. After Culpepper complained formally through counsel about her unequal pay, CSC knowingly and willfully continued to pay Culpepper at a level substantially below that of her male colleague who performed comparable work.

88. As a direct and proximate cause of CSC's violations of the Equal Pay Act, Culpepper has suffered significant monetary damages.

## COUNT II
## The Equal Pay Act of 1963 ("EPA") 29 U.S.C. § 215(a)(3)
## Retaliation

89. Culpepper incorporates and re-alleges the allegations in the foregoing paragraphs as though alleged fully herein.

90. Culpepper is an "employee" as defined by 29 U.S.C. § 203(e)(2)(ii).

91. Defendant is an "employer" as defined by 29 U.S.C. § 203(d).

92. Culpepper engaged in protected activity under the Equal Pay Act in December 2019 when she complained to Petrick and then Cam Knight about the disparity in her pay and asked that it be remedied.

93. CSC took immediate adverse employment action against Culpepper when her supervisor told her she could be fired for making complaints about pay disparities and Culpepper reasonably feared that she would be fired.

94. CSC took an adverse employment action against Culpepper when it denied her a raise after she complained about the disparity in her pay.

95. CSC, through Petrick, took an adverse employment action against Culpepper from December 2019 to June 2020 when it began a campaign of stripping certain responsibilities from Culpepper – particularly creative marketing duties such as photography and started attempting to characterize Culpepper's role as Administrative.

96. CSC took an adverse employment action against Culpepper when it terminated her and then refused to give her a positive employment reference while giving a positive employment reference to her male comparator.

97. Culpepper applied for unemployment after being terminated and was denied because the Virginia Employment Commission could not verify her prior wage information. Wiese was approved immediately for unemployment.

98. Under information and belief Wiese signed the severance agreement proffered by CSC and Culpepper did not. The proffered agreement specifically stated it would not interfere with her unemployment claim.

99. Culpepper was not paid for her last two days of work at CSC.

100. These actions served to deter Culpepper from seeking to fully redress her rights under the EPA and were motivated by a wish to retaliate against her for complaining about discriminatory pay practices.

101. As a result of CSC's unlawful retaliation in violation of the Equal Pay Act, Culpepper has suffered damages.

## COUNT III
**Title VII of the Civil Rights Act of 1964 ("Title VII")  42 U.S.C.  § 2000e, et seq.**
### Discrimination Based on Sex

102. Culpepper incorporates and re-alleges the allegations in the foregoing paragraphs as though alleged fully herein.

103. Culpepper is female.

104. Culpepper is an "employee" within the meaning of 42 U.S.C. § 2000e(f).

105. CSC is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

106. At all times relevant to this complaint, Culpepper was fully qualified for the position she held at CSC.

107. CSC discriminated against Culpepper based on her sex when it paid a male employee significantly higher wages than Culpepper, and that male employee: performed substantially the same work as Culpepper, had essentially the same level of skill and responsibility as Culpepper, and worked under substantially the same conditions as Culpepper.

108. CSC took these actions against Culpepper based, in whole or in part, on her sex.

109. As a result of CSC's unlawful sex discrimination against Culpepper, Culpepper has suffered damages.

## Count IV
## Title VII of the Civil Rights Act of 1964 ("Title VII")
## 42 U.S.C. § 2000e, et seq.
## Retaliation

110. Culpepper incorporates and re-alleges the allegations in the foregoing paragraphs as though alleged fully herein.

111. Culpepper is female.

112. Culpepper is an "employee" within the meaning of 42 U.S.C. § 2000e(f).

113. CSC is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

114. Culpepper engaged in protected activity under the Title VII in December 2019 when she complained to Petrick and then Cam Knight about the disparity in her pay and asked that it be remedied.

115. CSC took immediate adverse employment action against Culpepper when her supervisor told her she could be fired for making complaints about pay disparities and Culpepper reasonably feared that she would be fired.

116. CSC took an adverse employment action against Culpepper when it denied her a raise after she complained about the disparity in her pay.

117. CSC, through Petrick, took an adverse employment action against Culpepper from December 2019 to June 2020 when it began a campaign of stripping certain responsibilities from Culpepper – particularly creative marketing duties such as photography and started attempting to characterize Culpepper's role as Administrative.

118. CSC took an adverse employment action against Culpepper when it terminated her and then refused to give her a positive employment reference while giving a positive employment reference to her male comparator.

119. Culpepper applied for unemployment after being terminated and was denied because the Virginia Employment Commission could not verify her prior wage information. Wiese was approved immediately for unemployment.

120. Under information and belief Wiese signed the severance agreement proffered by CSC and Culpepper did not. The proffered agreement specifically stated it would not interfere with her unemployment claim if Culpepper signed it, thus serving as a clear threat of the opposite if she did not sign the agreement.

121. Culpepper was not paid for her last two days of work at CSC.

122. These actions served to deter Culpepper from seeking to fully redress her rights under Title VII and were motivated by a wish to retaliate against her for complaining about discriminatory pay practices.

123. As a result of CSC's unlawful retaliation in violation of Title VII Culpepper has suffered damages.

### Prayer for Relief

124. For violations of the Equal Pay Act, 29 U.S.C. § 206(d), Culpepper demands such legal and equitable relief as provided by 29 U.S.C. § 216(b), including but not limited to the following: economic damages including front and back pay; liquidated damages; reasonable attorneys' fees and costs; and any other relief this Court may deem just and equitable.

125. For violations of the Equal Pay Act, 29 U.S.C. § 215(a)(3), Culpepper demands such legal and equitable relief as provided by 29 U.S.C. § 216(b) which may effectuate the purposes of 29 U.S.C. § 215(a)(3), including but not limited to: economic damages, including front and back pay; liquidated damages; reasonable attorneys' fees and costs; and any other relief this Court may deem just and equitable to effectuate the purposes of 29 U.S.C. § 215(a)(3).

126. For violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., Culpepper demands such legal and equitable relief as the Court may deem just, including but not limited to: front pay; back pay; compensatory damages; punitive damages; and any other relief this Court may deem just and equitable to effectuate.

127. For violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), et seq., Culpepper demands such legal and equitable relief as the Court may deem just, including but not limited to: front pay; back pay; compensatory damages; punitive damages; and any other relief this Court

may deem just and equitable to effectuate.

Trial by jury is demanded on all issues on which plaintiff is entitled to trial by jury, including any question concerning whether plaintiff's claims must be submitted to arbitration.

                Respectfully Submitted

                ASHLEY NICOLE NOONAN

                By: s/Johneal White

Johneal M. White (VSB No. 74251)
GLENN ROBINSON CATHEY MEMMER & SKAFF PLC
400 Salem Avenue, S.W., Suite 100
Roanoke, Virginia 24016
jwhite@glennrob.com
(540) 767-2200 – Phone
(540) 767-2220 – Fax
    Counsel for Plaintiff Ashley Nicole Noonan