CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
11/18/2021
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

ASHLEY NICOLE NOONAN,

                    *Plaintiff*,

    v.

CONSOLIDATED SHOE COMPANY, INC.,

                    *Defendant*.

CASE NO. 6:20-cv-00068

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

**I**

Ashley Noonan claims that her employer, Consolidated Shoe Company, Inc., paid her less than a male colleague because of her sex in violation of the Equal Pay Act and Title VII. She also claims that she was retaliated against, in violation of these statutes, when she challenged the pay disparity.

Consolidated brings this motion for summary judgment, asserting that no rational finder of fact could find that Matthew Wiese, Noonan's proffered male comparator, held a virtually identical (as required by the EPA) or similar (as required by Title VII) job to that held by Noonan. Consolidated also argues that Noonan cannot show retaliation because Consolidated did not respond to Noonan's pay-disparity claim in a way that would dissuade a reasonable employee from asserting a charge of discrimination.

Consolidated's motion will be granted. The prima facie showing required of a sex-based wage discrimination plaintiff is a rigorous one. It is not enough that the plaintiff identify a colleague of the opposite sex who is paid more and who holds a similar title, or even a similar

job description in the abstract. The plaintiff and the comparator must share the same role in the defendant organization. Noonan has not identified such a person. Even on the most plaintiff-friendly view, the record shows that Wiese's job required a much higher level of skill in graphic design than was expected of Noonan. Indeed, the focus of Noonan's background, as well as her job duties at Consolidated, was commercial writing. Not graphic design.

The standard for a retaliation claim is also demanding. Adverse action by an employer does not constitute unlawful retaliation unless it is "materially adverse." That is, unless the action would dissuade a reasonable employee from coming forward with a discrimination claim. The Fourth Circuit looks for major employment consequences such as a demotion, decrease in salary, or substantially unfavorable job reassignment. The actions that Noonan puts forward, even taken in the light most favorable to her, do not rise to the level of material adversity.

## II

### *Summary Judgment*

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant meets this standard when the plaintiff fails to produce evidence that could justify a verdict in her favor. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015). The analysis draws all inferences in the plaintiff's favor. *Id*. at 565 n. 1. But summary judgment must be awarded if a plaintiff can offer no more than "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).

### *Sex-Based Wage Discrimination in Violation of the Equal Pay Act*

The Equal Pay Act prohibits employers from paying employees different salaries for equal work based on their sex. 29 U.S.C. § 206(d)(1). To make out an EPA violation, Noonan must make a preliminary showing of three things: "(1) the [employer] paid higher wages to an employee of the opposite sex who (2) performed equal work on jobs requiring equal skill, effort, and responsibility (3) under similar working conditions." *Spencer v. Va. State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019).

The second element "is a demanding threshold requirement." *Id*. To show "equal work," Noonan must identify a fellow-employee—i.e., the comparator—who performed work that was "virtually identical" to hers—"[s]imilarity of work is not enough" and "a plaintiff may not rely on broad generalizations at a high level of abstraction" to make her comparison. *Id*. at 203–04. A comparison fails, for example, "if the more highly paid job involves additional tasks which (1) require extra effort (2) consume a significant amount of time and (3) are of an economic value commensurate with the pay differential." *Wheatley v. Wicomico Cty.*, 390 F.3d 328, 333 (4th Cir. 2004) (internal quotation marks omitted). But the converse is not true. Work is not equal in the necessary sense because it is similarly difficult—or even because it is more difficult. That a plaintiff "did *better* or *more* work [] does nothing to prove equality of work." *Spencer*, 919 F.3d at 205 n. 2.

Even small differences can defeat the "equal work" requirement. In *Kling v. Montgomery County, Maryland*, summary judgment was granted because the plaintiff was "only responsible for outreach to the Hispanic community," while the proffered comparator "was responsible for outreach to all minority communities." 774 Fed. App'x. 791, 793 (4th Cir. 2019).

The deficiency of surface-level equality also bears emphasizing. Plaintiffs sometimes attempt to create the impression of equality by describing duties at a high level of abstraction.

But the Fourth Circuit takes a more probing approach. University professors in different departments, for example, were not viable comparators even though all professors performed "the same essential tasks" of "preparing syllabi and lessons, instructing students, tracking student progress, managing the classroom, providing feedback, and inputting grades." *Spencer*, 919 F.3d at 204. And the suggestion that the plaintiff professor did more or better work—because she conducted research and published while her comparators did not—only undermined her claim of equality. *Id*. at 205 n. 2. Similarly, it was not proper to compare a county's Director of Emergency Services with the Director of Recreation, Director of Parks & Tourism, or Director of Public Works because each supervisor performed "completely different functions" despite their shared titles. *Wheatley*, 390 F.3d at 333.

If Noonan were to succeed in making out a prima facie EPA claim, the factfinder could infer that any pay disparity was based on sex discrimination. The burden would then shift to Consolidated to show that the difference in pay was motivated by some factor other than sex. *Spencer*, 919 F.3d at 203.

### *Sex-Based Wage Discrimination in Violation of Title VII*

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discriminate against any individual with respect to his compensation . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Claims of sex-based wage discrimination under Title VII, unlike EPA claims, require a showing of intentional discrimination. *Spencer*, 919 F.3d at 207. Absent direct or circumstantial evidence of intentional discrimination, plaintiffs must "develop an inferential case" using the burden-shifting framework of *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973). As with EPA claims, plaintiffs must make certain threshold showings: "To establish a prima facie case of gender discrimination, a plaintiff must

show: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *Gerner v. Cty. of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012) (internal quotation marks omitted).

The fourth prong of Title VII's threshold requirement is analyzed much like the second element of a prima facie EPA case. *See Spencer*, 919 F.3d at 207 ("Where, as here, the prima facie case of wage discrimination is based on comparators, the plaintiff must show that she is paid less than men in similar jobs."). Except that "Title VII requires compared jobs to be only 'similar' rather than 'equal,' as required under the Equal Pay Act." *Id*. Even so, "the plaintiff must provide evidence that the proposed comparators are not just similar in *some* respects, but are similarly situated *in all respects*." *Id*. at 207–08 (internal quotation marks omitted).

To decide whether two jobs are "similar" in the necessary sense, courts must consider "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Id*. at 207 (internal quotation marks omitted) (emphasis original).

### *Retaliation*

Title VII and the EPA make it unlawful for any employer to discriminate against an employee because she has opposed an unlawful employment practice. 42 U.S.C. § 2000e-3(a) (providing that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]"); *Boyd v. Rubbermaid Commercial Products, Inc.*, 135 F.3d 769, *1 (4th Cir. 1998) (applying the Title VII retaliation test for an EPA claim). "A prima facie

case of retaliation requires proof that: (1) the plaintiff engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action." *Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018).

To satisfy the second element, a plaintiff must show that the challenged action was significant enough to deter a reasonable employee from coming forward with a charge of discrimination. *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 68 (2006) (clarifying that the second element requires *materially* adverse action.). "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id*. With respect to the reassignment of job duties, the *Burlington* Court said that whether the "reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington*, 548 U.S. at 71 (internal quotation marks omitted). In *Burlington*, the plaintiff had been reassigned from a forklift operator position to that of a track laborer. Because "the jury had before it considerable evidence that the track laborer duties were by all accounts more arduous and dirtier; that the forklift operator position required more qualifications, which is an indication of prestige; and that the forklift operator position was objectively considered a better job and the male employees resented [plaintiff] for occupying it," it was reasonable for the jury to "conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee." *Id*. (internal citations and quotation marks omitted).

Importantly, "a personal conflict alone does not constitute retaliation." *Spencer*, 919 F.3d at 208. In *Evans v. International Paper Company*, the Fourth Circuit affirmed a grant of summary judgment where the only adverse employment actions asserted were: a work evaluation

that was slightly harsher than past evaluations, negative comments from a co-worker, and being generally treated worse—i.e., left out of meetings and being ignored—than other employees. 936 F.3d 183, 195 (4th Cir. 2019). With respect to the constructive criticism, the panel reasoned that a supervisor's identification of a growth area for an employee, "whether rightly or wrongly," does not rise the level of materially adverse action. *Id*. With respect to the comment from a co-worker, that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id*. (quoting *Burlington*, 548 U.S. at 68). And with respect to being treated worse than other employees, that "general complaints are also not enough to create a genuine issue of material fact." *Id*.

### III

### *Sex-Based Wage Discrimination*

Noonan has failed to make out a prima facie case under either the EPA or Title VII. Specifically, she has failed to identify a better-paid male comparator who performed equal work (EPA) or who was similarly situated (Title VII) to her. Even construing the evidence in the light most favorable to Noonan, the inescapable conclusion is that Matthew Wiese had a different role at Consolidated than Noonan.

The closest Noonan comes to showing equality or similarity of work between her and Wiese is when comparing Wiese's work to the graphic-design responsibilities she was tasked with during an interim in which Consolidated was without a full-time graphic designer. In that period, Noonan claims she was managing Consolidated's graphic design needs on top of the responsibilities associated with her position. Pl.'s Ex. A at 205:14–15. But while Noonan initially asserts that she did Wiese's job before Wiese was hired, *id*. at 169:15, that assertion is

contradicted by the remainder of her testimony. And it is belied beyond all rational disagreement by the record as a whole. *Cf. Anderson*, 477 U.S. at 252 ("By its very terms, [the summary judgment] standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). In short, while the record supports a finding that Noonan performed basic graphic design functions at Consolidated while Consolidated searched for a more experienced full-time graphic designer, it does not support a finding that Noonan did equal or similar work for Consolidated to the work Wiese would eventually do.

Noonan was hired as Consolidated's Content Marketing Coordinator in February 2016. Pl.'s Ex. A at 61:3–7; 60:4. From the job posting, it is evident that this position was primarily that of a writer—with other skills being beneficial, but not necessary. *See* Def.'s Ex. O (describing the Content Marketing Coordinator position as being for someone with a "strong background in creative writing, web content management and visual marketing. Experience managing web-sites, photography, and graphic design capabilities a plus"). Consolidated was looking for an employee who could "creat[e] compelling fashion blog posts and on-brand product descriptions," "increase consumer engagement with creative writing," "coordinat[e] and execut[e] photography for branded lifestyle imagery" and "[c]oordinat[e] updates to e-commerce sites using consistent copy and design to optimize traffic." *Id*. Concededly, the creation of "beautiful graphic design and strong imagery" was listed among the duties and responsibilities for the role. *Id*. But only a "working knowledge" of Adobe Creative Suite (a suit of graphic design software including Photoshop, Illustrator, and InDesign) was a required qualification. *Id*.

8

By contrast, applicants needed "excellent written and oral communication skills, especially blogging and medium format writing." *Id*.

Noonan's background fits the bill for a writing job. Her cover letter, which Noonan submitted as part of her application to work for Consolidated, described her experience as being in the areas of public relations, journalism, and writing for published works. Pl's Ex. A at 51:11–14. And that representation is confirmed by other evidence. Noonan graduated from Liberty University in 2013 with a major in communications and minors in writing and PR and advertising. *Id*. at 13:16–20. She does not have a degree in graphic design. When she applied to work for Consolidated, her unpaid work experience included an internship with Liberty Counsel, a public interest law firm, and an internship with the Association for Unmanned Vehicle Systems International ("AUVSI"). Def.'s Ex. I. Noonan does not claim to have done graphic design work in either of these roles. Again, her focus was writing. When she was at Liberty Counsel, she "ran social media", "wrote press releases", "did research", "wrote radio scripts", "did radio" and "helped with filming." Pl's. Ex. A at 26:16–18. At AUVSI, she "wrote press releases, did daily stories, worked for conferences, events that the company held, did podcasts", and "did their weekly newsletter." *Id*. at 27:14–17.

With respect to paid experience, Noonan had been Speaker Development Manager at FDA News, Marketing Manager at Minnieland Academy (a day care with almost two-dozen schools spread across the State), and Online Marketing Consultant for Top Line Media. Def.'s Ex. I. Noonan does not claim to have done serious graphic design work in these jobs either. Pl.'s Ex. A at 29–34; Def.'s Ex. I. Noonan did initially state that during her seven months working as Marketing Manager for Minnieland Academy she "created graphics" using "InDesign and Photoshop." *Id*. at 31:1–4; Def.'s Ex. I. But when pressed, Noonan explained that her reference

9

to "creating graphics" referred to the act of "piecing together fonts and photos, or stock imagery or pictures[.]" Pl.'s Ex. A at 31:22–23.

Despite the emphasis on writing suggested by her background and job description, a plaintiff-friendly view of the evidence allows that Noonan did some graphic design work during her time at Consolidated. But not because that is what she was hired to do. Shortly after Noonan started at Consolidated, Consolidated's graphic designer, Yarra Hwang, left the company. *Id* at 64:1–3.

Noonan initially stated that she took over all of Hwang's duties at that time. *Id*. at 67:2–5. But the evidence does not support that conclusion. Noonan herself admitted that she could not be sure she had taken over *all* of Hwang's tasks. In her words, "there may have been a few things that we just didn't prioritize due to the fact that we didn't have another person to do the role." *Id*. at 67:21–24. All Noonan could state with confidence was that she had taken over the "essential" and "major" tasks. *Id*. at 68:5–11. This could be taken to mean that Noonan was doing the core of complex tasks that any graphic designer Consolidated might hope for would have been performing. Or it could be taken to mean that Noonan was serving as a stopgap by performing the functions that could not be put off while the company searched for a more experienced graphic designer. But only the latter interpretation is consistent with the record. According to Noonan, supervisors "throughout the chain" insisted that her graphic design assignments were temporary, *id*. at 121:8–14, and that hiring another graphic designer was something the company "talked about a lot" during this period, *id*. at 131:10. Similarly, Kristina Petrick, Noonan's direct supervisor, insisted that Noonan was only doing "basic entry-level graphic design projects" during this period. Def.'s Ex. D at 31:10–11. And that after Consolidated's graphic designer left,

10

"there were several projects that had been benchmarked [*sic*] with the lack of a graphic designer." *Id*. at 32:19–20.

Noonan's claim that the job Wiese was hired for was the job that she was already performing is also belied by the record. At the outset, this assertion is seriously weakened by her admission that she did not actually know what Wiese's job duties were. Pl's Ex. A at 201:8–9; 202:3–4; 202:18–20; 203:18–204:2; 210:20–24. And it utterly collapses with her eventual concession that she *did* know that Wiese performed tasks after he came on that she never did. In Noonan's own words, the lack of a full-time graphic designer meant that her team "didn't have a whole lot of time to play, to do the extra features that Matt [Weise] was able to do later on." *Id*. at 205:20–22. Critically, those "extra features" included things that Noonan herself admits she did not know how to do. *Id*. at 205:24–206:4 ("Q. These extra features that we've been talking about, are those things that you also knew how to do? A. Not at that time, no. Q. Do you know how to do them now? A. No.").

All of this corroborates Consolidated's claim that Wiese was hired to do a job that he was uniquely suited for. And not "simply because there was too much graphic design work form [*sic*] both Noonan and Petrick to handle themselves." Dkt. 34 at 20, Indeed, in contrast to Noonan's paltering, Kristina Petrick, who served as the supervisor of both Noonan and Wiese, gave the following unrebutted testimony regarding Wiese's role:

> Matt [Wiese] was responsible, as soon as he started, to redo the entire templates and create templates for each of the brands that was unique to the brands. That would follow our brand guidelines, including selection of new fonts, different ways to lay out our logo headers and our footers. So the entire suite of brands were updated to have a whole new look and branded feel.
> Def.'s Ex. D at 34:19–35:1.

In the same vein, Consolidated's interrogatories offered the following summary of Wiese's duties:

> Mr. Wiese's primary duties involved graphic design—creating .jpeg images and other wholesale graphics, creating e-mail marketing graphics and lookbooks, SEO video and PDF content creation, video shooting as necessary, and creating campaign materials, sales support materials, logo design concepts, branding, etc. Mr. Wiese also created "design templates"—an advance [*sic*] graphic design duty that Plaintiff was not assigned. This means he was responsible to create complex concepts and layout from scratch that would be followed and adhered to by multiple team members as the "correct" layout and design.

Pl's Ex. V, No. 14. This interrogatory was included in Noonan's exhibit list and is cited in her brief. But Noonan neither disputes that Wiese performed these tasks, nor does she claim she ever performed them. Nowhere, for example, does she claim to have created SEO video, PDF content video, logo design concepts, branding, or design templates (as defined by the interrogatory). *Compare* Dkt. 34 at 12–13 (summarizing Noonan's job duties as "creating jpegs with prices, other wholesale graphics, e-blasts, printing, and working with lookbooks", "respond[ing] to basecamp requests", "manag[ing] influencers", "maintain[ing] photos, tags, and images", "create[ing] brand presentations", "work[ing] on search engine optimization and handl[ing] video production until it was handed over to Wiese", "manag[ing] catalogue creation," and "create[ing] graphics for billboards, magazine advertisements, e-mail, and social media.").

Presumably, Wiese was able to do the work that had to be put on hold before his arrival because he had a background in graphic design that Noonan did not. Unlike Noonan, Wiese had a degree in graphic design. Def.'s Ex. J. And he had experience doing graphic design work for major employers. He served for a year as Graphic Designer for TrueLife.org; over four years as Graphic Designer for Liberty University; over a year as Graphic Designer for the Seattle

Sounders; as a Freelance Graphic Designer for Cotton Incorporated, and as Senior Associate of Creative Services for the Harris Corporation. *Id*.

In conclusion, Noonan and Wiese both did graphic design work for Consolidated. But only in an abstract, generalizable sense can they be said to have had comparable jobs. Wiese was hired to do the work that others at the company, including Noonan, could not. Noonan has failed to show a genuine factual dispute.

### *Retaliation*

During an annual review that took place in December 2019, Noonan informed her supervisor, Kristina Petrick, that based on the pay differential between her and Wiese she believed she was the subject of discrimination. Pl's Ex. I at ¶ 34. The parties do not dispute that this was protected activity. According to Noonan, Petrick responded by telling Noonan it was a fireable offense for Noonan to know the salary of a co-worker. *Id*. at ¶ 35.[1]

In addition to that conversation, Noonan also asserts that the following constituted illegal retaliation: certain of her job responsibilities were taken from her, including photography projects, email marketing tasks, and video projects following the December 2019 meeting, *id*. at ¶ 44; Petrick began to behave in a "cold" and unfriendly manner toward Noonan, *id*. at ¶ 45; and Noonan did not receive a reference from Consolidated's Human Resource director at the time of her separation,[2] *id*. at ¶ 47–49.

Noonan has identified a Second Circuit decision in which summary judgment was overturned on a retaliation claim where a supervisor suggested that the plaintiff could lose his

---

[1] Petrick testified that she said that "whoever told you [Wiese's salary] should be fired." Def's Ex. D at 140:1–2.

[2] The parties agree that Noonan's termination was related to COVID-19 cutbacks and not this suit.

job for filing complaints of discrimination. *See Rivera v. Rochester Genesee Regional Transp. Authority*, 743 F.3d 11, 26 (2d Cir. 2012) ("A reasonable juror could find both that Tiberio threatened Talton with the loss of his job, and that this threat would 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'") (quoting *Burlington*, 548 U.S. at 68) (alterations in original). But even if this Court were to agree that a jury could find that a threat of termination alone could constitute material adversity, the facts of *Rivera* differ from this case in important respects.

"Context matters" in the material adversity analysis because "the significance of any given act of retaliation will often depend upon the particular circumstances." *Burlington*, 548 U.S. at 69. In *Rivera*, the plaintiff was threatened with termination for making a discrimination claim. Petrick, by contrast, erroneously thought that employees were prohibited from inquiring about the salaries of their co-workers, *see* Pl's Ex. D at 140:7–8, and conveyed that belief to Noonan.[3] Perhaps in some contexts this could be taken as an indirect threat of retaliation for bringing forward a claim of illegal pay-disparity.[4] But the statement cannot take on that significance where, as here, it is never repeated and was soon corrected by the Director of Human Resources. *See* Def's Ex. H at 76:22–25 (HR Director told Noonan that Petrick was mistaken, and that Noonan could not be fired for knowing the salary of a co-worker). What is more, far from firing Noonan, Consolidated actually investigated her claim. *Id.* at 82. No rational finder of fact could find that an objectively reasonable employee would be dissuaded by Petrick's initial statement once it is contextualized within the larger course of events. *See Hinton*

---

[3] Because material adversity is determined objectively, based on the reactions of a reasonable employee, *Burlington Northern*, 548 U.S. at 69–70, the Court does not give weight to Noonan's claim that though she "was aware of the law, [she] did not trust [Consolidated] to actually follow it and feared that she would in fact be terminated." Dkt. 34 at 29.

[4] Noonan does not claim to proceed by direct evidence.

14

*v. Virginia Union University*, 185 F.Supp.3d 807, 832 (E.D. Va. 2016) ("This Court finds that reprimands without collateral consequences are akin to non-actionable snubbing, antipathy, and petty slights.").

With respect to the reassignment of job duties, the failure of the HR Director to provide a reference, and Petrick's "cold" attitude toward Noonan, Noonan has not offered sufficient evidence from which one could reasonably infer both that these adverse actions were material and were undertaken *because of* her complaints about pay disparity. There is no indication that she lost duties of greater prestige or ease, for example. She does not even testify that she was particularly devastated to lose these duties. With respect to changes in the social dynamic at work, "a personal conflict alone does not constitute retaliation." *Spencer*, 919 F.3d at 208. And the HR Director's decision not to provide a reference for Noonan is explainable by the fact that Noonan rejected the severance agreement which offered a neutral recommendation. And even if the jury were to reject that explanation and find Noonan's characterization of the HR Director's behavior accurate, the difference between a neutral letter offered as part of a severance agreement and no letter at all is insufficient to rise to the level of material adversity.

## IV

Defendant's Motion for Summary Judgment, Dkt. 28, will be granted.

The Clerks of the Court is directed to send this Memorandum Opinion and accompanying Order to all counsel of record.

ENTERED on this 18th day of November, 2021.

*[signature]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE